## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT
### NEW HAVEN DIVISION

| | |
|---|---|
| PHILIP COWIT, and MATTHEW RHOADES, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　- against -<br><br>RICOLA USA INC.,<br><br>　　　　　　　Defendant | Class Action Complaint<br><br>Jury Trial Demanded |

Philip Cowit ("Plaintiff Cowit"), and Matthew Rhoades ("Plaintiff Rhoades") ("Plaintiffs"), allege upon information and belief, except for allegations about Plaintiffs, which are based on personal knowledge:

## I.    IMPORTANCE OF AUTHENTICITY TO CONSUMERS

1.    For a growing number of consumers, authenticity is a key factor in making quick purchasing decisions.[1]

2.    Such products valued by consumers for their connection to specific places include whisky from Scotland, sake from Japan, and tomatoes from Italy.

3.    Reasons include (1) an expectation that a product made in the location where it was first developed or perfected will be of higher quality and value, due to expertise and local knowledge, and (2) a desire to support and maintain local

---

[1] Zane Radcliffe, Story Time: The importance of Authentic Provenance for Food and Drink Brands, The Drum Network, May 28, 2015.

traditions and cultures at the expense of commoditized products.

4.    Studies have found that consumers will pay more money for what they perceive to be authentic products linked to a specific place.

5.    Authenticity is increasingly important in the context of herbal and botanical ingredients, where factors such as soil, temperature, farming, labor, elevation, and local knowledge, assure consumers of the quality of what they are buying.[2]

6.    Switzerland is at the forefront of this trend, because its specialization in herbal ingredients dates to the Middle Ages.

7.    Its monasteries, run by the Benedictines, drew on the ancient botany teachings of the Greeks and Romans in caring for the sick, before modern medicine.

8.    Geography left the Swiss little choice to use what they could grow in their small gardens and fields, since the rugged, mountainous terrain made transport outside of villages challenging.[3]

9.    These gardens were a "veritable laboratory of healing herbs," cultivated by generations, in secret.[4]

---

[2]  Josef A. Brinckmann, "Geographical Indications for Medicinal Plants: Globalization, Climate Change, Quality and Market Implications For Geo-Authentic Botanicals," World Journal of Traditional Chinese Medicine, 1.1 (2015): 16-23.
[3] Valais Wallis Promotion, The Power of Alpine Herbs.
[4] Federal Office for Culture Herbal Knowledge in the Convents Of Central Switzerland, Living Traditions in Switzerland.



10. The sisters of Swiss convents continue this work, cultivating and harvesting the same herbal ingredients, in the same ways, as in the Middle Ages.





11. This history of herbal medicines was told in Das Grosse Kraüterheilbuch,

by Swiss priest Johann Künzle, who instructed readers to use what they grow in their gardens to "heal ailments from diabetes to flu."[5]

12.    According to Greg Abbott, a former botanist at Geneva's Jardin Botanique, "The Swiss are famously self-sufficient, so the culture of growing and making their own medical treatments plays right into that mindset."

13.    Today, the Swiss people take pride in the "treasure troves of healing herbs and medicinal plants grown in [their] home gardens – a veritable pharmacy in [their] front yard[s]."[6]



14.    These herbal ingredients are essential to local teas, foods, and healing products, which contribute to the country's higher than average life expectancies.

## II.    INCREASE IN USE OF HERBAL INGREDIENTS

---

[5] Jennifer Liu, Swiss Gardens: A Pharmacy in One's Backyard, The Swiss Times, Apr. 22, 2022.
[6] Paige Baschuk, In the Land of Pharma, Why the Swiss Turn to Natural Meds, The Swiss Times, Feb. 9, 2022.

15.    This historical knowledge and tradition with respect to herbal ingredients is a reason Switzerland is home to more than forty of the world's largest pharmaceutical companies, accounting for half of its exports.

16.    Despite the country's leadership in pharmacology, the Swiss people have not forgotten their country's heritage.

17.    This was confirmed by a recent referendum, allowing use of herbal ingredients to treat common ailments.[7]

18.    In this regard, the Swiss are at the forefront of a global trend.

19.    According to consumer research firm Mintel, the market for therapeutic products based on whole, herbal ingredients is over $10 billion per year and growing.

## III. LEGAL BACKGROUND

20.    Almost one hundred years ago, in response to companies that promoted the quality of their products through references to specific places associated with such items, i.e., "Florida Oranges," and "Idaho Potatoes," but consisted of less valuable components, the Federal Food, Drug and Cosmetic Act ("FFDCA") set

---

[7] Dal Cero M, Saller R, Weckerle CS, Herbalists of Today's Switzerland and Their Plant Knowledge. A Preliminary Analysis from an Ethnobotanical Perspective. Forsch Komplementmed. 2015;22(4):238-45. doi: 10.1159/000438809. Epub 2015 Aug 17. PMID: 26566214; SD Klein et al., "Usage of Complementary Medicine in Switzerland: Results of the Swiss Health Survey 2012 and Development Since 2007," PLoS One. 2015 Oct 29; 10(10):e0141985. doi: 10.1371/journal.pone.0141985. Erratum in: PLoS One. 2015; 10(12):e0144676. PMID: 26513370; PMCID: PMC4626041.

limits on what the public was required to be told. 21 U.S.C. § 301 *et seq*.; 21 C.F.R. Parts 200 and 300.

21.    Connecticut and Ohio adopted these laws through the Connecticut Food, Drug, and Cosmetic Act ("CFDCA"), the Ohio Pure Food and Drug Law ("OPFDL"), and accompanying regulations to "promote uniformity" and "protect[]…the purchasing public from injury by merchandising deceit." Conn. Gen. Stat. § 21a-91 *et seq*. (requiring that it "must be interpreted to conform to the [FFDCA].") and Ohio Rev. Code § 3715.01 *et seq*.[8]

22.    The newly established Food and Drug Administration ("FDA") recognized that "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging."

23.    It developed rules to protect the public from the common practice of over-the-counter ("OTC") products being promoted based on certain valuable ingredients, even though their efficacy was from other, less valuable, and more common ingredients.[9]

---

[8] Title 21a, Subtitle 21a-115, Consumer Protection, Department of Consumer Protection, CFDCA, Regs., Conn. State Agencies § 21a-115-1 *et seq*.
[9] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Products Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326; Okamoto and Ippeita, "Extrinsic Information Influences Taste and Flavor Perception: A Review

## IV.  LABELING IS MISLEADING

24.   To appeal to consumers who value authenticity and products associated with places known for quality, Ricola USA Inc. ("Defendant") sells "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic."



from Psychological and Neuroimaging Perspectives," Seminars in Cell & Developmental Biology, 24.3, Academic Press, 2013.

25.  The Product is "misbranded" and misleading to consumers because despite its labeling as "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," its efficacy is not derived from herbal ingredients grown in the Alps of Switzerland, but menthol, a chemical compound extracted from herbs, grown on the plains of India.

26.  This is revealed (1) through the fine print on the back of the package, where it is identified as the "Active Ingredient (in each drop)," with its "Purposes" described as a "Cough suppressant [and] Oral anesthetic" and (2) analysis of global production of menthol. 21 U.S.C. § 352(a)(1); Conn. Gen. Stat. § 21a-106(a); Ohio Rev. Code § 3715.64.[10]

---

[10] "Misbranded" is the statutory term for labeling that is false and/or misleading.



27.    Menthol, also known as 5-Methyl-2-(propan-2-yl)cyclohexan-1-ol, is a monoterpenoid known for its cooling properties.

28.    This chemical compound, obtained from plants in the genus *Mentha*, exists as one pure stereoisomer.

29.  The most common mint source for menthol is corn mint (*arvensis*), but spearmint (*spicata*) and peppermint (*piperita*) are also used.

30.  According to conservative estimates, India produces eighty percent of the world's mint crop, equivalent to 40,000 tons, across the Indo-Gangetic plains in the states of Uttar Pradesh, Madhya Pradesh, and Bihar.[11]

31.  Almost all menthol used in pharmaceutical products worldwide is from India, and based on corn mint.

32.  This is because therapeutic products use vastly greater amounts, and require consistency, which only India can provide.

33.  To extract menthol from corn mint plants requires a series of complicated steps, including steam distillation, fractionation, and purification, accompanied by solvents.



---

[11]  Counsel of Scientific & Industrial Research, From Importing Menthol to Becoming a Leading Exporter.

34.   Though countries like Switzerland may produce small amounts of mint, its labor-intensive harvesting, lower value relative to other crops, and significantly smaller geographic area, means that the menthol used in the Product is not from Switzerland.

35.   As the Product's active ingredient, menthol is the "component that is intended to furnish [its] pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body." 21 C.F.R. § 201.66(c)(2).

36.   In contrast, the "Swiss Alpine Herbs," promoted on the front as the source of the Product's "Cough suppressant [and] Oral anesthetic" properties, are "Inactive Ingredients," comprising the "Ricola herb mixture" of elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, and sage. 21 C.F.R. § 210.3(b)(8).

37.   These are defined as components of the Product other than the active ingredient of menthol. 21 C.F.R. § 210.3(b)(8).

38.   While "inactive ingredients" may not always be "inert," their effects are limited to causing negative interactions with other medications, instead of acting on the condition sought to be addressed.

39.   The Product's labeling, "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild

thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," is misleading because it "includes [] [Swiss Alpine Herbs] but not [menthol] even though [this] [is] stated elsewhere in the labeling," on the fine print of the back of the package. 21 C.F.R. § 201.6(b); Regs., Conn. State Agencies § 21a-115-16(b).

40.   The Product's labeling, "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," is misleading because this "fanciful proprietary name" is used "to imply [it] has some unique effectiveness or composition when, in fact, [it] is a common substance [a menthol lozenge]." 21 C.F.R. 201.10(c)(3).

41.   The Product's labeling, "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," is misleading by "featuring in the labeling of inert or inactive ingredients in a manner that creates an impression of value greater than their true functional role in the formulation." 21 C.F.R. 201.10(c)(4).

42.   The Product's labeling, "Original Herb Cough Drops," promoted as

"Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," causes consumers to expect its efficacy is derived from these "Swiss Alpine Herbs," even though (1) its active ingredient is not an herbal ingredient in the manner understood by consumers, because it is a compound extracted and refined, from an herb, (2) its active ingredient is not from the Swiss Alps, but the Indian plains, and (3) none of the Swiss Alpine Herbs depicted on the front label provide any therapeutic benefit, since they are "inactive ingredients."

43.   As a result of the false and misleading representations, the Product is sold at a premium price, approximately $3.49 for 21 lozenges, and higher prices when sold in larger quantities, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

**JURISDICTION**

44.   Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

45.   The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

46.   Plaintiff Cowit is a citizen of Connecticut.

47.   Defendant is a citizen of New Jersey based on its corporate formation.

48.   Defendant is a citizen of New Jersey based on its principal place of business.

49.   The Court has jurisdiction over Defendant because it transacts business within Connecticut and sells the Product to consumers within Connecticut from retail stores such as grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, other similar locations, and online, to citizens of this State.

50.   Defendant transacts business in Connecticut, through the sale of the Product to citizens of Connecticut from retail stores such as grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, other similar locations, and online, to citizens of this State.

51.   Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

52.   Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, type, origins, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent

courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

53.    Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, type, origins, amount and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

## VENUE

54.    Plaintiff Cowit resides in New Haven County.

55.    Venue is in this Court, in the New Haven Division of this District, because a substantial or entire part of the events or omissions giving rise to Plaintiff Cowit's claims occurred in New Haven County.

56.    Venue is in this Court, in the New Haven Division of this District, because Plaintiff Cowit's residence is in New Haven County.

57.    Plaintiff Cowit purchased, used, and/or consumed the Product in reliance on the packaging, labeling, representations, and omissions identified here in New Haven County.

58. Plaintiff Cowit first became aware the packaging, labeling, representations, and omissions, were false and misleading, in New Haven County.

## PARTIES

59.   Plaintiff Philip Cowit is a citizen of New Haven County, Connecticut.

60.   Plaintiff Matthew Rhoades is a citizen of Cuyahoga County, Ohio.

61.   Defendant Ricola USA Inc. is a New Jersey corporation.

62.   Defendant manufactures and sells herbal lozenges under the Ricola brand.

63.   The Product is sold in various sizes with uniform representations, omissions, labeling, and packaging.

64.   Plaintiffs are like most consumers and prefer products associated with a place known to produce that product, such as whisky from Scotland, sake from Japan, and tomatoes from Italy, because they expect such products to be of higher quality, based on history and expertise in that area.

65.   Plaintiffs are like most consumers and prefer therapeutic products which get their benefits from whole herbal ingredients, instead of compounds derived from herbal ingredients.

66.   Plaintiffs are like most consumers and look to the front label of therapeutic products to see what they are buying and to learn basic information about it.

67.   Plaintiffs are like most consumers and are accustomed to the front label of packaging telling them what a product is, its features, and in the context of OTC

products, the source of those features, i.e., its effective or active ingredients.

68.  Plaintiffs are like most consumers and when they see a front label which promotes a product by highlighting its ingredients and components in connection with a location known for those ingredients and components, they expect its main and intended features will be from those ingredients and components.

69.  Plaintiffs read, saw, and relied on the packaging and labeling of "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic."

70.  Plaintiffs expected the Product's main and effective ingredients in acting as a "Cough Suppressant [and] Oral Anesthetic" would be the "Swiss Alpine Herbs," grown in Switzerland, and depicted on the front label.

71.  Plaintiffs relied on the omission of how the Product's active ingredients were not "Swiss Alpine Herbs," or any herbs, but menthol, a compound isolated and obtained from herbs, not in Switzerland, but in India, as this related to its functionality as a "Cough Suppressant [and] Oral Anesthetic."

72.  Plaintiffs did not expect that the Product's efficacy would not come from herbs grown and cultivated in Switzerland, but compounds derived and extracted from herbs, grown in India.

17

73.   Plaintiffs bought the Product with the labeling identified here, "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," at around the above-referenced price.

74.   Plaintiff Cowit purchased the Product between February 2021 and February 2024, at grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, and/or other similar locations in Connecticut.

75.   Plaintiff Rhoades purchased the Product between February 2022 and February 2024, at grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, and/or other similar locations in Ohio.

76.   Plaintiffs paid more for the Product than they would have had they known its main and effective ingredients in acting as a "Cough Suppressant [and] Oral Anesthetic" would not be the "Swiss Alpine Herbs," grown in Switzerland, depicted on the front label, but compounds derived from herbal ingredients, grown in India, as they would not have bought it or would have paid less.

77.   The Product was worth less than what Plaintiffs paid, and they would not have paid as much absent Defendant's false and misleading statements and

omissions.

78.   Plaintiffs chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

## CLASS ALLEGATIONS

79.   Plaintiffs seek to represent the following classes:

> **Connecticut Class**: All persons in Connecticut who purchased the Product in Connecticut during the statutes of limitations for each cause of action alleged, expecting its main and effective ingredients would be herbs grown in Switzerland; and
>
> **Ohio Class**: All persons in Ohio who purchased the Product in Ohio during the statutes of limitations for each cause of action alleged, expecting its main and effective ingredients would be herbs grown in Switzerland.

80.   Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediate family members of any of the foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

81.   Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiffs and

class members are entitled to damages.

82.    Plaintiffs' claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

83.    Plaintiffs are adequate representatives because their interests do not conflict with other members.

84.    No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

85.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

86.    The class is sufficiently numerous, with over 100 members, because the Product has been sold throughout the State for several years with the representations, omissions, packaging, and labeling identified here, at hundreds of retail locations and online to citizens of this State.

87.    Plaintiffs' Counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

### CAUSES OF ACTION

### COUNT I
Connecticut Unfair Trade Practices Act ("CUTPA"),
Conn. Gen. Stat § 42-110a, *et seq*.
and Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev. Code §
<u>1345.01 *et seq*.</u>

88.   Plaintiffs incorporate by reference paragraphs 1-43.[12]

89.   The purpose of the CUTPA and OCSPA ("State Consumer Protection Acts") is to protect consumers against unfair and deceptive practices.

90.   This includes making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

91.   The State Consumer Protection Acts considers false advertising, unfair acts, and deceptive practices in the conduct of any trade or commerce to be unlawful.

92.   Violations of the State Consumer Protection Acts can be based on other laws and standards related to consumer deception.

93.   Violations of the State Consumer Protection Acts can be based on the principles of the Federal Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles. 15 U.S.C. § 45 *et seq*.

94.   A State Consumer Protection Act violation can occur whenever any rules promulgated pursuant to the FTC Act, 15 U.S.C. § 41 *et seq*., are violated.

95.   A State Consumer Protection Act violation can occur whenever the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts relating to the FTC Act are violated.

96.   A State Consumer Protection Act violation can occur whenever any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or

---

[12] To the extent any incorporation by reference is required.

unconscionable acts or practices is violated.

97.   In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

98.   In considering whether a product's label is misleading, it is required to consider not only representations made or suggested by statements, images, and/or design, but also the extent to which it fails to prominently and conspicuously reveal facts relative to the proportions or absence of certain ingredients or other facts concerning ingredients or attributes, which are of material interest to consumers.

99.   Defendant's false and deceptive representations and omissions with respect to the Product's contents, origins, ingredients, type, functionality, and/or quality, that "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," meant its main and functional ingredients were herbs from Switzerland, instead of compounds derived and extracted from herbs, grown in India, are material in that they are likely to influence consumer purchasing decisions.

100. This is because consumers (1) prefer products associated with a place

known for those products, because they expect them to be of higher quality, based on history and expertise in that area, and (2) prefer therapeutic products which get their benefits from entire herbal ingredients, instead of compounds derived from herbal ingredients, through complex processing methods.

101. The substitution of compounds derived from herbal ingredients from India for whole herbal ingredients, from Switzerland, as the source of the Product's efficacy, is of material interest to consumers, because the latter are of higher quality and price.

102. The labeling of the Product violated the FTC Act and thereby violated the State Consumer Protection Acts because the representations, omissions, packaging, and labeling, "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," created the erroneous impression the Product's main and functional ingredients were herbs from Switzerland, when this was false, because its main and functional ingredient was a compound derived from herbs, grown in India.

103. The labeling of the Product violates laws, statutes, rules and regulations which proscribe unfair, deceptive, or unconscionable acts or practices, thereby violating the State Consumer Protection Acts.

104. Violations of the State Consumer Protection Acts can be based on public policy, established through statutes, law, or regulations.

105. The labeling of the Product violates laws, statutes, rules and regulations that are intended to protect the public.

106. The labeling of the Product violated the State Consumer Protection Acts because the representations, omissions, labeling, and packaging, "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," when its main and functional ingredient was a compound derived from herbs, grown in India, not Switzerland, was unfair and deceptive to consumers.

107. The labeling of the Product violated the State Consumer Protection Acts because the representations, omissions, packaging, and labeling of "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," when this was false, because its main and functional ingredient was a compound derived from herbs, grown in India, not Switzerland, was contrary to statutes and regulations of the CFDCA and OPFDL identified below, which adopted the FFDCA and accompanying regulations, to prohibit consumer deception by

companies in the labeling of OTC products.

| Federal | Connecticut | Ohio |
|---|---|---|
| 21 U.S.C. § 352(a)(1) | Conn. Gen. Stat. § 21a-106(a) | Ohio Rev. Code § 3715.64 |
| 21 C.F.R. § 201.6(b) | Regs., Conn. State Agencies § 21a-115-16(b) | |
| 21 C.F.R. 201.10(c)(3) | | |
| 21 C.F.R. 201.10(c)(4) | | |

108. Plaintiffs believed the Product's main and effective ingredients were "Swiss Alpine Herbs," grown in Switzerland, even though its active ingredient was a compound derived from herbs, grown not in Switzerland, but in India.

109. Plaintiffs paid more for the Product and would not have paid as much if they knew that the Product's main and effective ingredients were not "Swiss Alpine Herbs," grown in Switzerland, because its active ingredient was a compound derived from herbs, grown not in Switzerland, but in India.

110. Plaintiffs seek to recover for economic injury and/or loss they sustained based on the misleading labeling and packaging of the Product, a deceptive practice under the State Consumer Protection Acts.

111. Plaintiffs will produce evidence showing how they and consumers paid more than they would have paid for the Product, relying on Defendant's representations, omissions, packaging, and labeling, using statistical and economic

analyses, hedonic regression, hedonic pricing, conjoint analysis, and other advanced methodologies.

112. As a result of Defendant's misrepresentations and omissions, Plaintiffs were injured and suffered damages by their payment of a price premium for the Product, which is the difference between what they paid based on its labeling, packaging, representations, statements, omissions, and/or marketing, and how much it would have been sold for without the misleading labeling, packaging, representations, statements, omissions, and/or marketing identified here.

<u>Jury Demand and Prayer for Relief</u>

Plaintiffs demand a jury trial on all issues.

**WHEREFORE**, Plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying Plaintiffs as representatives and the undersigned as Counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiffs' attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   April 18, 2024

<div style="margin-left:40%">
Respectfully submitted,

/s/  Joshua D. Levin-Epstein
Levin-Epstein & Associates P.C.
777 W Putnam Ave Ste 300
</div>

Greenwich CT 06830
(212) 792-0046
joshua@levinepstein.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiffs*

Joshua D. Levin-Epstein

Levin-Epstein & Associates P.C.

*Counsel for Plaintiffs*

**Certificate of Service**

I certify that on April 18, 2024, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

|  | CM/CEF | First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant's Counsel | ☐ | ☐ | ☐ | ☐ |
| Plaintiffs' Counsel | ☒ | ☐ | ☐ | ☐ |
| Court | ☒ | ☐ | ☐ | ☐ |

/s/ Joshua D. Levin-Epstein